## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**KEVIN TRACY,**
        **Petitioner,**

**v.**                                          **Case No.  3:05cv152/RV/MD**

**JAMES MCDONOUGH,[1]**
        **Respondent.**

_____

### ORDER and
### REPORT AND RECOMMENDATION

Before the court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  (Doc. 1).  Respondent filed an answer, submitting relevant portions of the state court record.  (Doc. 12).  Petitioner has filed a reply.  (Doc. 18).  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After careful consideration of all issues raised by petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that petitioner is not entitled to relief, and that the petition is without merit and should be denied.

### PROCEDURAL HISTORY

On December 9, 1999 petitioner was charged with sexual battery with a deadly weapon (Count 1), armed kidnaping (Count 2) and aggravated battery with a deadly

_____

[1]James McDonough succeeded James Crosby as Secretary of the Florida Department of Corrections, and is automatically substituted as the respondent.  Fed.R.Civ.P. 25(d)(1).

weapon (Count 3), in the Circuit Court of Escambia County, Florida, case number 99-4691. (Doc. 12, Ex. A, pp. 1-2).[2]  A jury found petitioner guilty as charged. (Ex. A, p. 330; Ex. B, pp. 428-49).  On July 5, 2000 petitioner was adjudicated guilty and sentenced to twenty years in prison followed by probation. (Ex. A, pp. 371-74, 394-99).  His conviction and sentence were affirmed on appeal without written opinion. *Tracy v. State*, 804 So.2d 1253 (Fla. 1st Dist. Ct. App. 2001) (Table) (copy at Ex. F). Thereafter, petitioner filed a motion for post-conviction relief pursuant to FLA.R.CRIM.P. 3.850, which was denied after a limited evidentiary hearing. (Ex. A, pp. 667-688).  Petitioner's appeal of the order denying relief was unsuccessful. *Tracy v. State*, 894 So.2d 251 (Fla. 1st Dist. Ct. App. 2005) (Table) (copy at Ex. K).  He now brings this federal habeas petition claiming one instance of ineffective assistance of counsel and three claims of trial court error.  Respondent asserts that the petition is timely. (Doc. 12, p. 4).

## TRIAL AND RELATED PROCEEDINGS[3]

The facts developed at trial were essentially these: On the night of October 5, 1999 Crystal Martin, the victim in this case, left the Lookers bar at around 11:00 p.m. (B-51-52, 91).[4]  She had not been drinking alcohol or using drugs. (B-52).  As she drove north on Pace Street, her car stalled. (B-52).  She coasted into a church parking lot at Pace and DeSoto. (B-52-53).  She was certain that her former boyfriend had sabotaged her car. (*Id.*).[5]

---

[2]Hereafter all references to exhibits will be to those provided at Doc. 12 unless otherwise noted.

[3]The facts stated herein are those presented at trial and viewed in the light most favorable to the prosecution.  See Jackson v. Virginia, 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Where there are conflicting inferences and disputes exist, this court must presume that the jury resolved such conflicts in favor of the prosecution, and must defer to that resolution. *Martin v. State of Alabama*, 730 F.2d 721,724 (11th Cir. 1984).

[4]The trial transcript was attached to the state's response (doc. 12) as Exhibit B. Citations to the transcript will be referenced as "B," followed by the appropriate page number.

[5]The weekend before October 5, 1999 Ms. Martin and her then-boyfriend, whom she had been living with, got into a fight and he made her move out of his house. (B-96).

A man in a maroon Buick with a white top, not in good condition, drove up. (B-53-54, 56).  He stopped and asked Ms. Martin if she needed help.  (B-54).  Ms. Martin later identified this man as petitioner.  (*Id.*).  Petitioner was wearing a white shirt, black pants, and a black corduroy hat "with a brim all the way around it like a fishing hat."  (B-56).  Petitioner gave Ms. Martin's car a push, first pushing it forwards (from the passenger's side rear) and then backwards (from the driver's side front near the headlights).  (B-56-57).  Ms. Martin attempted to start the car, but was unsuccessful.  (B-56).  She told petitioner she was going to use a payphone to call her boyfriend.  (B-58).  Petitioner offered Ms. Martin a ride to the payphone.  She initially declined because of its proximity; however, after petitioner pointed out that he had been nice enough to help her, and that it was getting late in a bad neighborhood, Ms. Martin decided to get into petitioner's car.  (*Id*).

Petitioner failed to turn in the direction of the payphone, and Ms. Martin asked him where he was going.  (B-59-60).  Petitioner said nothing, drove a little further and stopped behind some buildings.  (B-60).  Upon stopping, he quickly drew something sharp from his left side using his left hand and put it to her throat.  Contemporaneously with his other hand, petitioner started pushing Ms. Martin's head from behind into the sharp object.  (B-104-05).  Ms. Martin felt the sharp object at her throat, and it made a mark.  (B-59).  Petitioner then pushed Ms. Martin down onto the passenger's side floorboard.  He began driving again, with his hand on her back, still holding the sharp object and pushing her into the floorboard.  (B-60, 62, 105).  Petitioner took a couple of turns and then parked.  He pulled Ms. Martin up. (B-63).  She told him she had a little boy and asked him what he wanted.  Petitioner responded: "What do you think I want?"  (*Id.*).  Ms. Martin asked him why he "didn't . . . just ask," to which he responded: "[B]ecause I know you white bitches, you don't want to give it up."  (*Id.*).

Petitioner then ordered Ms. Martin to take her pants off.  She asked him where he was taking her and he responded, "to my house where it's quiet."  (*Id.*).  He again told her to take her pants off; she begged him to leave her alone, and she asked him to use a condom.  (B-63-64).  In taking his clothes off, petitioner took a gun from his

pants and threw it on the back seat of the car.  (*Id.*).  Ms. Martin was wearing a tampon, and when petitioner penetrated her the tampon was pushed up inside her. (B-64-65).  At no time did Ms. Martin agree to have consensual sex with petitioner. (B-81).  After petitioner finished, he told Ms. Martin to put her pants back on, and then pushed her back onto the floorboard and drove off.  (B-64).  He dropped her off approximately one block from her car.  (B-64-65).  Ms. Martin ran to a nearby bar and had someone call the police.  (B-66).

Escambia County Deputy Sheriff Edward Lewis responded to the call and transported Ms. Martin to the hospital.  (B-342, 346).  Ms. Martin was met at the hospital by a victim's advocate Michele Peavy.  (B-145).  A rape kit examination was performed in which Ms. Martin was physically examined, a blood sample was drawn, vaginal and mouth swabs were taken, and the tampon removed.  (B-147).  The next day, Ms. Martin moved into Favor House.  (B-69, 92, 95).

Approximately two weeks later, Ms. Martin was driving north on Pace Street. As she passed a Circle K at Jordan Street, she saw petitioner walking south, carrying a tire.  (B-70).  He was wearing the same outfit, including the hat, he had worn the night he attacked her.  (B-56, 70).  Ms. Martin's observation of petitioner at the Circle K occurred at approximately 5:00 in the afternoon, and Ms. Martin testified that it was daylight and that she got a good look at him.  (B-71).  Petitioner recognized Ms. Martin; they made eye contact; and then he "kind of shook his head." (B-72).

At approximately 7:00 the next morning Ms. Martin was again driving in that area.  It was daylight.  She saw petitioner's car sitting by an air pump at the same Circle K.  (B-73).  There was no one near the car.  She then saw a man run out of the Circle K, but did not get a good look at him.  (B-75-76).  Ms. Martin quickly turned her car around and stopped at a red light.  (B-76).  She got part of the car's tag number, and let it pull out in front of her so she could get the rest.  After she got the full tag number she called Investigator Mark Wass, told him of the last two days' events, and gave him the tag number of the car.  (B-77).

Investigator Wass testified that after he spoke with Ms. Martin, he ran the tag number and got a registration off of it which came back to petitioner.  (B-198).  He then showed Ms. Martin a photographic lineup consisting of six photographs, one of which was an old picture of petitioner that the sheriff's department had on file. (B-200).  She did not pick anyone out at that time because Investigator Wass had advised her that if she wasn't "exactly sure that the subject was in there, not to make a selection," (B-202), and she "wasn't sure."  (B-78).

On November 3, 1999 Investigator Wass met with petitioner.  At the interview he told petitioner that there had been a rape at Pace and Desoto and asked if petitioner knew if his vehicle had been involved, or if he had been involved.  (B-207). Petitioner denied raping anyone, and suggested other persons who may have been using his car.  (B-207-08).  Wass asked if he could fingerprint petitioner and take his photograph, and petitioner agreed.  (B-295).  On November 9, 1999 Investigator Wass learned that petitioner's fingerprints matched the fingerprints lifted from Ms. Martin's car.  (B-298).  He prepared a warrant application for petitioner's arrest and contacted petitioner to set up an interview.   (B-299).   The two scheduled a meeting for November 16, 1999.  Investigator Wass then obtained an arrest warrant but did not immediately arrest petitioner because he wanted to get more information from him at their upcoming meeting.

Sometime between November 9 and November 16, Ms. Martin and Investigator Wass met at the Escambia County Jail.  (B-78).  While the two were waiting to go into a conference room, Investigator Wass was paging through his file.  The light hit the back of a single photograph that was in the file (the photograph of petitioner that Wass had taken on November 3), and Ms. Martin recognized the man in the photograph as her attacker.  She told Investigator Wass, "That's him."  (B-79, 83). After they entered the conference room, Investigator Wass took the photograph out of the file, explaining that "he wasn't telling [her] this was the guy that . . . raped [her]," just that "this is who the tag number to the car comes back to."  (B-83).  Wass testified that he showed Ms. Martin the photograph only after she identified it.  (B-317).  He did not ask Ms. Martin if that was her attacker; nor did he make another

photographic lineup with petitioner's recent photograph because he felt it unnecessary -- he had already established that petitioner's fingerprints were on Ms. Martin's car.  (B-301).

Investigator Wass met with petitioner on November 17, 1999.  Before the interview began petitioner signed a *Miranda* waiver.  (B-305-06).  During the interview, petitioner changed his story several times.  According to Wass' testimony:

> A [INVESTIGATOR WASS].  Okay.  At first he [petitioner] stated that he didn't help anyone on Pace and DeSoto that night on the 5th.  And I advised him that I compared his prints with the ones that was [sic] on the car, and also showed him a picture of the victim, and he stated that he had never seen her before.  Then I told him he was lying, that I know he was there, his prints were there, and he changed his story.
> . . . .
>
> . . . He stated he found someone there that had car trouble and he took them to a phone booth, dropped them off, and left.
> . . . .
>
> I advised him that his story wasn't matching up with the victim's story, and then he changed it again.  He stated that she asked him if he had a condom, and he said yes, and they had got in his car to drive off.
> . . . .
>
> He stated they had sex and he brought her back to the area where they were first at.  He dropped her off at a phone booth and left her there.

(B-306-07).  Investigator Wass arrested petitioner at the close of their meeting.  (B-308).  He searched petitioner's car on November 24, 1999 pursuant to a search warrant, and recovered three knives, including a carpet knife which was found underneath a piece of carpet on the driver's floorboard.  (B-308-09).

In addition to Ms. Martin's testimony, prosecution witness Michele Peavy testified that she was present when the nurse examined Ms. Martin.  (B-146).  During the rape kit examination, Ms. Peavy and the nurse noticed a small scratch on the right side of Ms. Martin's neck.  Ms. Peavy also observed the nurse pull the tampon out and put it into an evidence bag.  (B-147).  When the rape kit was finished, Ms. Peavy got it and "turned it into ID for analysis."  (B-148).

A fingerprint examiner testified for the state that petitioner's fingerprints matched those lifted from Ms. Martin's car. (B-135, 139, 298). Additionally, the state presented the testimony of two DNA experts who testified that the DNA profile from semen on Ms. Martin's tampon matched the DNA profile of petitioner. (B-221, B-239). One of the DNA experts further testified that the odds of falsely including petitioner (*i.e.*, of selecting another random person unrelated to petitioner who would also match the DNA patterns found on Ms. Martin's tampon), were 1 in 5.6 quadrillion. (B-240, 281).

The defense was that of consent, relying primarily on the lack of evidence of trauma to the vaginal area and the absence of blood on the knives seized from petitioner's car. Defense counsel also attempted to impeach the credibility of the State's witnesses, particularly Ms. Martin and Investigator Wass.

As mentioned earlier, the jury found petitioner guilty of all charges, and he was sentenced on Counts 1 and 2 to concurrent terms of twenty years in prison followed by five years probation, and on Count 3 to 15 years in prison, concurrent with Counts 1 and 2. (Ex. A, pp. 372-73).

## DISCUSSION

Standard of Review

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> **(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or**
>
> **(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.**

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The appropriate test was described by Justice O'Connor as follows:

> **In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.**

120 S.Ct. at 1523 (O'Connor, J., concurring). Under the test just described a habeas court does not examine the State court's ruling to see if it is correct, but examines it only to see if it is reasonable. More recently, in *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003), the Supreme Court instructed that, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Id.*, 123 S.Ct. 1172. The law is "clearly established" if

Supreme Court precedent at the time "would have compelled a particular result in the case." *Neelley v. Nagle*, 138 F.3d 917, 923 (11th Cir. 1998).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Lockyer,* 123 S.Ct. at 1173 (quoting *Williams v. Taylor*, 529 U.S. at 405-06, 120 S.Ct. at 1519-20). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases--indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (quoting *Williams*, 529 U.S. at 405-06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 529 U.S. at 409, 120 S.Ct. at 1521. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. *Holland v. Jackson*, 542 U.S. 647, 124 S.Ct. 2736, 2737-38, 159 L.Ed.2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court

case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context."  *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001); *see also Carr v. Schofield*, 364 F.3d 1246, 1250 (11th Cir. 2004) (A state court decision involves an unreasonable application of clearly established Federal law if the State court decision "identifies the correct governing Supreme Court legal principle . . . but . . . 'refuses to extend the governing principle to a context in which the principle should have controlled.'" (quoting *Ramdass v. Angelone*, 530 U.S. 156, 166, 120 S.Ct. 2113, 2120, 147 L.Ed.2d 125 (2000))).

Section 2254(d)(1) requires more than mere error, and more even than clear error on the part of the State court before federal habeas relief may be issued.  *E.g., Mitchell v. Esparza*, 540 U.S. 12, 124 S.Ct. 7, 12, 157 L.Ed.2d 263 (2003) ("We may not grant respondent's habeas petition, however, if the state court simply erred. . . ."); *Lockyer, supra*, 538 U.S. at 75, 123 S.Ct. at 1175 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); *Early v. Packer*, 537 U.S. at 11, 123 S.Ct. at 366 (State court "decisions which are not 'contrary to' clearly established Supreme Court law can be subjected to habeas relief only if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law. . . ."); *Williams, supra*, 529 U.S. at 410-12, 120 S.Ct. at 1522-23 (The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion.").

Only if the federal habeas court finds the State court decision to be contrary to, or an unreasonable application of, clearly established Supreme Court law does it take the final step of conducting an independent review of the merits of the petitioner's claims.  *Neelley*, 138 F.3d 917.  Even so, the writ still will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication  "resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that:  "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Crawford v. Head*, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides for a "highly deferential standard of review" for factual determinations made by a state court).

## Exhaustion and Procedural Default

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[6] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."  *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S.

---

[6] Section 2254 provides, in pertinent part:

(b)(1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

(A)  the applicant has exhausted the remedies available in the courts of the State; or

(B) (i)  there is an absence of available State corrective process; or

(ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. *Duncan*, *supra*, 513 U.S. at 365-66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Picard*, 404 U.S. at 277-78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In *Picard v. Connor*, *supra*, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.* at 278, 92 S.Ct. at 513, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  In *Anderson v. Harless*, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  *Id.* 459 U.S. at 7, 103 S.Ct. at 278 (citing *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)).  The only manner in which the habeas petitioner had cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law."  *Anderson*, 459 U.S. at 7, 103 S.Ct. at 278 (internal quotation marks omitted).  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the <u>cited</u> case advanced a federal claim.  Furthermore, the Court clarified that such a

citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  459 U.S. at 7 and n. 3, 103 S.Ct. at 278 and n. 3.

Years later, the Supreme Court readdressed the "fair presentation" requirement in *Duncan v. Henry*, *supra*.  The *Duncan* Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[7]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." *Duncan*, 115 S.Ct. at 888.  Very recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that  "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  *Baldwin v. Reese*, 541 U.S. 27, 124 S.Ct. 1347, 1351, 158 L.Ed.2d 64 (2004).  The *Baldwin* Court commented that "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"  *Id.*  This language, while not part of the Court's holding, provides an instructive and useful rule of thumb.

Prior to *Duncan*, the Eleventh Circuit broadly interpreted the "fair presentation" requirement.  *See*, *e.g.*, *Watson v. Dugger*, 945 F.2d 367 (11th Cir. 1991) (finding issue to be exhausted when petitioner argued in state court that trial court misapplied state law when it refused to give petitioner's requested jury instruction

---

[7]The petitioner in *Duncan* raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

and thereby allowed the jury to convict without necessary showing of criminal intent, and argued in federal court that this was a due process violation); *Mattox v. Dugger*, 839 F.2d 1523 (11th Cir. 1988) (holding that a federal habeas corpus petition should not be dismissed on grounds of procedural default when a petitioner has previously brought an issue before a state court alleging only state law violations, when such a claim is equally supported by federal law, and the state cites such federal law in support of its position); *Hutchins v. Wainwright*, 715 F.2d 512, 518-19 (11th Cir. 1983) (petitioner exhausted Sixth Amendment confrontation clause claim in state court by raising hearsay objections, even though petitioner never raised Sixth Amendment claim in state court). However, after *Duncan*, the Eleventh Circuit has taken a more restrictive approach. For example, in *Zeigler v. Crosby*, the Circuit Court held that the habeas petitioner failed to "fairly present" his juror misconduct claims to the state courts where his brief to the state appellate court did not refer to the federal constitutional issues raised in his federal habeas petition, and none of the cases cited in his direct appeal discussed the Federal Constitution. 345 F.3d 1300, 1307 (11th Cir. 2003). The court specifically noted that the section of the petitioner's appellate brief which dealt with juror misconduct contained the words: "Appellant was denied due process and a fair trial. . . .," which could be interpreted as asserting a fair trial claim under the Florida Constitution and Florida's Due Process Clause. *Id.* at 1308 n.5. The only cases cited in the discussion of the issue in petitioner's state appellate brief were state supreme court cases that made no mention of the United States Constitution and cited no federal cases. The court concluded that petitioner's "[c]ursory and conclusional sentence (unaccompanied by citations to federal law), . . . did not present to the Florida courts the federal claim asserted to us." *Id.*

An issue that was not presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, *i.e.*, procedurally barred from federal review. *O'Sullivan*, 526 U.S. at 839-40, 848, 119 S.Ct. at 1734. This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground

of procedural bar or default.  *Coleman v. Thompson*, 501 U.S. 722, 734-35 and n. 1, 111 S.Ct. 2546, 2555, 115 L.Ed.2d 640 (1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); *Chambers v. Thompson*, 150 F.3d 1324, 1326-27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L.Ed.2d 812 (1991).  However, a petitioner may obtain federal review of his claim if the state procedural rule is applied in an "arbitrary or unprecedented fashion," *Judd v. Haley*, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner.  *Ford v. Georgia*, 498 U.S. 411, 424-25, 111 S.Ct. 850, 858, 112 L.Ed.2d 935 (1991); *Upshaw v. Singletary*, 70 F.3d 576, 579 (11th Cir. 1995).

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim.  *Tower*, 7 F.3d at 210; *Parker*, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."  *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)).  Lack of counsel or ignorance of available procedures is not enough to establish cause.  *Tower v. Phillips, supra*. To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 85, 130 L.Ed.2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  *Schlup*, 513 U.S. at 327.  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error

with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.*

Within this framework, the court will review petitioner's claims.

<u>Petitioner's Claims</u>

1.      **"Violation of due process by tricking me into answering questions without a lawyer by telling me I was not a suspect."**

In his first ground for relief, petitioner explains that when Investigator Wass learned that the car identified as being involved in the rape was petitioner's car, Wass left a message for petitioner to call him.  According to petitioner, he contacted attorney Randall Etheridge about accompanying him to the interview.  Etheridge called Investigator Wass and was told by him that petitioner was not a suspect, so there was no need for a lawyer.  As a result, petitioner attended the interview alone.  Petitioner contends that he <u>was</u> suspect at that time; that Wass misrepresented his status to Etheridge; that but for this misrepresentation he would not have talked to Wass; and that "[his] statements to Wass were used against [him] at trial, and made it more difficult for [petitioner] to establish reasonable doubt as to [his] guilt."  (Doc. 1, p. 3, ¶14.I.).  Petitioner asserts that he presented this issue to the state court in a pre-trial motion to suppress and on direct appeal. Respondent asserts a procedural default defense, arguing that in state court petitioner premised his claim on state, not federal law, and that any attempt to return to state court to litigate his federal claim would be procedurally barred.  Petitioner filed a reply, but did not address this issue.

On direct appeal, petitioner raised four issues, one of which was the following: "Investigator Wass Violated Due Process By Telling Tracy's Lawyer Tracy Was Not A Suspect, Thereby Inducing The Lawyer To Send Tracy To Be Interviewed Without Counsel."  (Ex. C, p. i).  Petitioner argued:

Wass's misrepresentation interfered with the attorney-client relationship between Tracy and Etheridge, in violation of *due process under the Florida constitution*, under <u>Haliburton v. State</u>, 514 So.2d 1088 (Fla. 1987) (<u>Haliburton II</u>).  The Florida Supreme Court had held in <u>Haliburton v. State</u>, 476 So.2d 192 (Fla. 1985) (<u>Haliburton I</u>), <u>vacated</u>, 475

U.S. 1078 (1986), that a waiver of Miranda rights is not knowing and voluntary if the police fail to advise the person being questioned that a lawyer is at the station seeking to speak with him. Haliburton I was vacated on Moran v. Burbine, 475 U.S. 412 (1986). Burbine held that the failure to advise the defendant that a lawyer wishes to see him does not make the waiver of counsel invalid, so no Fifth Amendment right is violated, and, if formal charges have not been filed, neither is any Sixth Amendment right infringed. Back in the Florida Supreme Court, Haliburton II found Justice Stevens' Burbine dissent persuasive, and held that *the due process clause of the Florida Constitution* prohibits interference with the attorney-client relationship, making statements obtained in violation of this due process right inadmissible even if no Fifth or Sixth amendment rights are implicated.

(Ex. C, pp. 23-24) (emphasis added). Petitioner went on to cite various state cases which had followed *Haliburton II* and held that the challenged conduct violated the due process clause of the Florida Constitution. Petitioner closed by stating that "Wass's misrepresentation in this case was an even more clear violation of due process than the police conduct in *Haliburton*." (*Id.*, p. 26). The First DCA affirmed petitioner's conviction without written opinion. (Ex. F).

The undersigned finds this case to be governed by *Duncan v. Henry*, *supra*, and *Zeigler v. Crosby, supra*. In his direct appeal, petitioner's position was grounded solely on state law--the due process clause of the Florida Constitution. He expressly raised his claim as a violation of the state constitution, to the exclusion of any federal constitutional right. Thus, this court must presume that the state court applied state law, specifically *Haliburton*, to resolve the issue.

To the extent petitioner now raises the same claim he presented to the state court in his direct appeal, he has provided no basis for federal habeas relief. Federal habeas relief is available to correct only federal constitutional injury. 28 U. S. C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 479-80, 116 L.Ed.2d 385 (1991) (errors that do not infringe upon a defendant's constitutional rights provide no basis for federal habeas corpus relief); *Wainwright v. Goode*, 464 U.S. 78, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983); *Barclay v. Florida*, 463 U.S. 939, 958-659, 103 S.Ct. 3418, 3429, 77 L.Ed.2d 1134 (1983) ("Mere errors of state law are not the concern of this court . . . unless they rise for some other reason to the level of a denial of rights

protected by the United States Constitution.") (citations omitted); *Engle v. Isaac*, **456 U.S. 107, 102 S.Ct. 2976, 73 L.Ed.2d 1361 (1981);** *Carrizales v. Wainwright*, **699 F.2d 1053 (11th Cir. 1983).  Questions of state law and procedure "rarely raise issues of federal constitutional significance. [A] state's interpretation of its own laws provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved."** *Tejada v. Dugger,* **941 F.2d 1551 (11th Cir. 1991),** *cert. denied*, **502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992) (quoting** *Carrizales, supra*). **"This limitation on federal habeas review is of equal force when a petition, which actually involves state law issues, is couched in terms of equal protection and due process."** *Branan v. Booth*, **861 F.2d 1507, 1508 (11th Cir. 1988).**

To the extent petitioner now attempts to raise a claim based on the Due Process Clause of the United States Constitution, this claim must have been fairly presented to the state courts in order for this court to review it.  Petitioner has not presented this federal claim to the state courts, and if he attempted to do so now the state courts would find it procedurally barred.  In such a case there is a procedural default for purposes of federal habeas review.  *Coleman v. Thompson*, **501 U.S. at 735 n.1, 111 S.Ct. 2546.**  Petitioner has made none of the requisite showings to excuse his default.  Therefore, this court should not consider the merits of this claim.

2.     "Violation of due process by use of suggestive identification procedure."

Petitioner next claims the trial court erred when it admitted Ms. Martin's in-court identification of petitioner and her pretrial photographic identification of him at the Escambia County Jail.  Respondent concedes petitioner exhausted his state court remedies with respect to this claim by raising the issue in a motion to suppress and on direct appeal.

A.     Clearly Established Federal Law

A pretrial identification and subsequent in-court identification may amount to a due process violation if the pretrial procedure was "unnecessarily suggestive and conducive to irreparable mistaken identification."  *Stovall v. Denno*, **388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967).** *See also Manson v,*

*Braithwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

In *Neil v. Biggers*, the Supreme Court established a two-step test in determining whether identification procedures are constitutional. The first step is to determine whether the procedures used were unduly suggestive. If so, the second step is to determine whether, under the totality of the circumstances, the identification was reliable. 409 U.S. at 199, 93 S.Ct. at 382. The factors to be considered in assessing reliability are:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199-200. "[R]eliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. at 114.

On federal habeas review, even if a petitioner demonstrates that an unconstitutional identification occurred, he is not entitled to relief if the identification constituted harmless error under the standard set forth in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Moore v. Illinois*, 434 U.S. 220, 232, 98 S. Ct. 458, 54 L.Ed.2d 424 (1977) (holding harmless error analysis applies to admission of identification testimony obtained in violation of a defendant's constitutional rights). In applying this analysis, courts are likely to find that the erroneous admission of the identification evidence was harmless where the evidence of guilt—excluding the contested identification evidence—is overwhelming.

### B.      Review of State Court Decision

The trial court denied petitioner's motion to suppress, finding as follows:

> In the case *sub judice*, three different "photographic line-ups" took place, namely: (1) when Wass presented the alleged victim with a photographic line-up which included an old photo of the Defendant, and she did not identify the Defendant as the perpetrator; (2) when the alleged victim inadvertently observed in Wass' file the back side of the recent photo Wass had taken of the Defendant and she "knew it was him" [indicating the perpetrator]; and (3) when Wass took the alleged

victim into a conference room at the jail and showed her that same single photograph and advised her that it was the man to whom the vehicle she identified was registered.

The perpetrator of the sexual battery had assisted the victim with her car before taking her to another site and committing the sexual battery upon her. She had an opportunity to see the perpetrator's face throughout this time and to observe him closely while he was on top of her. The day she saw the man on the street she recognized as the perpetrator, she made and maintained eye contact with him and got a very good look at him in the daylight.

The next day she saw the vehicle, obtained the tag number, and gave it to Investigator Wass, who then prepared a photographic line-up which included an old file photo of Defendant, since the tag number came back registered to Defendant. While she did not pick out the Defendant from the photo line-up, she immediately recognized him from the newer photo, even though she saw it only from the back at first. She claimed that the reason she did not recognize Defendant from the old line-up photo was because in that photo he was heavier and his hair was longer. While this Court's observation of the photos and the Defendant corroborate that the Defendant appears some[what] different in the old photo, the difference does not appear substantial. However, the difference was material to the alleged victim.

Thus, while the single photo display was unnecessarily suggestive, there does not appear to be a substantial likelihood of misidentification by the alleged victim. Therefore, the identification of the Defendant as the perpetrator by the alleged victim will not be suppressed, nor will the victim be precluded from making an in-court identification of the Defendant, if she is able so to do.

(Ex. A, pp 212-13). In his direct appeal, petitioner argued that the trial court erred in failing to suppress the identifications. (Ex. C, pp. 29-41). The state argued that any possible error in admitting the identifications was harmless, given the evidence in the case. The First DCA affirmed petitioner's conviction without written opinion.

The undersigned finds that even assuming *arguendo* that the victim's pretrial and in-court identifications of petitioner were unnecessarily suggestive and violated petitioner's due process rights (an issue this court need not and does not decide), the state court's denial of relief on this claim was neither contrary to, nor an

unreasonable application of, clearly established federal law because admission of the identification evidence was harmless.

Identification was not a disputed issue in this case. Furthermore, Ms. Martin's identification of petitioner was not emphasized by the prosecution, and did not play a substantial role in the state's case. In its opening statement, the state did not so much as mention Ms. Martin's single-photograph identification of petitioner at the Escambia County Jail, nor did it mention that she would be making an in-court identification of petitioner. (B-35-43). To establish identification at trial, the state relied substantially on fingerprint evidence, DNA evidence, and petitioner's admissions to Investigator Wass. In her closing argument, the prosecutor made only a single and vague reference to the single-photograph identification. (B-371-73). Moreover, petitioner never argued mistaken identity at trial. Instead, he argued that the sex was consensual; that Ms. Martin later decided to accuse petitioner of sexual battery due to the situation with her former boyfriend; and that Investigator Wass knowingly assisted Ms. Martin in sustaining this false charge.[8] Furthermore, defense counsel fully exposed the jury to the various problems with Ms. Martin's identification during cross-examination of Ms. Martin and Investigator Wass, and during closing statements. In light of the foregoing, it appears beyond a reasonable doubt that Ms. Martin's identification of petitioner was not of determinative significance in the jury's deliberation. Petitioner is not entitled to federal habeas relief on this clam, and the writ should not issue. *See, e.g., Blanco v. Singletary*, 943

---

[8]During opening statements at trial, the defense argued that there was insufficient evidence that petitioner used force to sexually batter Ms. Martin, inasmuch as there was no evidence of trauma to her vaginal area. (B-47). Defense counsel ended his opening statement with: "Basically you may have here two people attempting to have sexual relations or consensual sex. But consensual sex gone bad does not equate to sexual battery." (B-50).

During closing arguments, the defense again emphasized the lack of medical evidence of forcible penetration. (B-377-78). Defense counsel argued:

[Ms. Martin] has sexual relations with [petitioner], doesn't use a condom, she's upset about that, he takes her back to an area right by a telephone to use -- where she could readily use a telephone. Does that sound like a sexual battery or rape, when she's taken right to an area where she could use a telephone?

(B-384).

F.2d 1477, 1508-09 (11th Cir. 1991) (finding that any error in permitting showup identification in which defendant was presented to murder victim's neighbor, who had not been able to see upper portion of assailant, was harmless; other evidence introduced at trial, particularly another witness' positive identification, made the neighbor's identification cumulative); *Jones v. Kemp*, 794 F.2d 1536, 1540 (11th Cir. 1986) (affirming denial of habeas relief where, under Georgia law, evidence that defendant was found in possession of victim's property three hours after robbery and offered no plausible explanation for possession was, by itself, sufficient to support robbery conviction beyond reasonable doubt, so that even if defendant demonstrated that victim's pretrial and trial identification of him was tainted by absence of defense counsel at preliminary hearing, any error was harmless.).

     3.    "<u>Violation of right to confront witnesses.</u>"

     In his third ground for relief, petitioner contends he was denied his right to confront the witnesses against him when the trial court prevented cross-examination of Ms. Martin concerning her prior deposition statements about using a tampon. According to petitioner, if cross on this subject had been allowed the defense would have been able to attack Ms. Martin's credibility with a prior inconsistent sworn statement and "would have been able to show that she had forgotten that she had a tampon in, and that she used a tampon all the time, even when not in her period, so it was less implausible than for most women that she might have engaged in consensual sex without taking the tampon out." (Doc. 1, pp. 4-5). Petitioner states he raised this claim on direct appeal. Respondent asserts this claim is procedurally defaulted because petitioner failed to present it in a procedurally correct manner in his direct appeal. Specifically, respondent asserts that on appeal, petitioner presented a different argument in support of his proposed examination of the victim than he had a trial, in violation of Fla. Stat. § 924.051(1)(b); thus, his claim on appeal was denied on procedural grounds. (Doc. 12, pp. 18-19). Respondent alternatively addresses the merits.

     At a state pretrial proceeding, the prosecutor successfully sought, by way of motion in limine, to exclude any mention that Ms. Martin worked as a topless dancer.

(Ex. A, pp. 317-18).[9]  At trial during the state's direct examination of Ms. Martin, the following colloquy occurred:

> Q [Prosecutor].  You testified earlier that that's -- did you tell them that you had a tampon in?
>
> A [Ms. Martin].  When I got to the hospital, I remember and I told them that, you know, I had a tampon in.
>
> Q.  Okay.  Were you wearing -- just asking why were you wearing a tampon?
>
> A.  I can't remember if I was on my period or not.  It was either close to my period and I was about to start.  I just usually always wear a tampon.

(B-85-86).  Prior to defense counsel's cross-examination of Ms. Martin, defense counsel argued:

> Judge, I believe that I'm entitled to go into an area now that the State's motion in limine addressed.
>
> The State . . . asked Ms. Martin whether or not why she had a tampon in, and Ms. Martin addressed that with one reason, but there was also another reason.  It was because that she is a dancer and she keeps a tampon in there when she is dancing. . . .

(B-88).  When asked by the court what this evidence would show, defense counsel responded:

> It goes to show one thing, whether or not she was, in fact, on her period at the time that this happened. . . .
>
> It also goes to her credibility as a witness because if she hasn't been forthright in stating all the reasons why she wears one, and I believe I'm entitled to find that out.

(B-88-89).  Defense counsel proffered part of his deposition of Ms. Martin, later read into the record, which reflected the following:

> Q [Defense counsel].  Was there a lot of blood on the car or anything?

---

[9]Although the record does not contain an order granting the motion, the trial court explicitly mentioned during the trial that it granted the motion.  (B-334).

A [Ms. Martin].  Well, I mean, I wasn't on my -- that's why I didn't remember because I wasn't on my period.  I just always wear a tampon whenever I am dancing because of, you know, you are wearing real tiny underwear and they are white, you don't -- I sweat a lot and I always keep a tampon in.

Q.  Okay.  But I wanted to make sure I understand, you were on your period or you were not on your period.

A.  I don't think I was on my period at the time, but I was wearing a tampon because I was dancing.

(B-333-34).  After the proffer was read into the record, defense counsel reiterated the basis of his request to use the deposition in cross-examination:

THE COURT: Okay.  It's my understanding that you want to elicit that from her to show that her testimony in court, that she was wearing the tampon because she thought it was her period, is untruthful.

[DEFENSE COUNSEL]: Untruthful and, in part, she had testified -- I believe the question was, why were you wearing a tampon?  That was the question.

THE COURT: Right.

[DEFENSE COUNSEL]: And according to her deposition that was taken back on March the 8th, she was wearing it because she was a dancer, not because she was on her period.

THE COURT: Okay.  But the purpose for eliciting that evidence would be to impeach the witness.

[DEFENSE COUNSEL]: Yes, sir.

THE COURT: I think my ruling was that impeachment on a collateral issue, that it doesn't prove or disprove a material fact in evidence one way or the other.  There is no denial that, in fact, she was wearing a tampon at the time.  There is no evidence before the jury about that.  The only thing that would be benefitted by that would be impeachment on a collateral issue and evidence to show that she was a topless dancer, which I've already ruled was inappropriately prejudicial.

(B-334).  The court reiterated its earlier ruling rejecting the proffered testimony. (*Id.*).

Thus, at trial defense counsel stated two purposes in eliciting the proffered

testimony: first, to show whether or not Ms. Martin was having her period at the time she was raped; and second, to impeach her credibility.

On direct appeal, petitioner argued that the proffered deposition testimony had two purposes: one, to show that Ms. Martin's use of tampons was "not typical," and two, because the deposition testimony "suggest[ed] that [Ms. Martin] forgot she had the tampon in." (Ex. C, p. 42). Petitioner argued that "[t]his evidence would not have demonstrated that Martin was likely to engage in consensual sex with a tampon in, but it would have shown the jurors that Martin used tampons in a different way from most women, which could have given them a basis to question the normal assumption that sex while using a tampon would not be consensual." (*Id.*). Tho two purposes articulated by petitioner on appeal were completely different than those articulated at trial.

In its answer brief, the state asserted that petitioner's Confrontation Clause claim was waived because petitioner's argument on appeal was different from the arguments asserted at trial. Therefore, the issue was not preserved for appellate review and barred under state procedural rules. The state alternatively addressed the merits of the issue. (Ex. D, pp. 20-27). In his reply brief, petitioner conceded that the state was correct that at trial the purpose defense counsel stated for wanting to cross-examine Ms. Martin about her deposition testimony was to use the deposition as a prior inconsistent statement, in order to impeach Martin's credibility. (Ex. E, p. 9). Petitioner went on to argue impeachment as an additional basis for granting relief on the issue. The First DCA affirmed petitioner's conviction without written opinion.

In his federal habeas petition, petitioner now raises a hybrid argument, combining one raised at trial with one raised on appeal: first, that the purpose of the proffered cross-examination was to use the deposition as a prior inconsistent statement in order to impeach Ms. Martin's credibility; and second, that the proffered testimony would show the jury that it was less implausible than for most women that Ms. Martin might have engaged in consensual sex without taking the tampon out. Arguably, this claim is procedurally defaulted.

Petitioner abandoned his impeachment argument by failing to raise it in his initial brief on direct appeal. *See State Dep't of Ins. v. First Floridian Auto and Home Ins. Co.*, 803 So.2d 771, 775 (Fla. 1st Dist. Ct. App. 2001) (declining to consider appellant's argument that was not made until its reply brief); *Page v. City of Fernandina Beach*, 714 So.2d 1070, 1083 (Fla. 1st Dist. Ct. App. 1998) ( "[A]n appellate court cannot consider matters which are raised for the first time on appeal in an appellant's reply brief" ) (Davis, J., concurring in part, dissenting in part); *Southeast Capital Fin. v. T/F Sys.*, 616 So.2d 482, 482-83 (Fla. 4th Dist. Ct. App. 1993) (holding that "the Appellants have waived their argument . . . as they raised this argument for the first time in their reply brief ."). As petitioner is now procedurally barred from returning to state court to present this aspect of his claim, it is procedurally defaulted.

As to petitioner's "atypical use" argument, he did not assert this argument at trial; therefore, the issue was not preserved for appellate review and barred under state procedural rules. *See Terry v. State*, 668 So. 2d 954, 961 (Fla. 1996) (reiterating well settled Florida law that "in order for an argument to be cognizable on appeal, it must be the specific contention asserted as the legal ground for objection, exception, or motion below;" and holding that defendant waived his claim that the trial court erred in denying his motion in limine to exclude a co-defendant's testimony, because his argument on appeal was different from those asserted pretrial and at trial);[10] *Steinhorst v. State*, 412 So.2d 332, 338 (Fla. 1982) (same); Fla. Stat. § 924.051(1)(b).[11]

---

[10]Prior to trial, Terry's motion in limine moved to prohibit the state from calling co-defendant Demon Floyd as a witness since "'[a]ny testimony given by this witness would be unreliable not only because he has given a number of inconsistent accounts, but because there is strong evidence that he may be mentally impaired.'" *Terry v. State*, 668 So. 2d at 961. At trial, when the state called co-defendant Floyd as a witness, Terry moved to exclude his testimony based on his motion for suggestion of conflict. On appeal, however, Terry claimed that the trial court erred because it is improper to call a witness for the primary purpose of placing impeachment testimony before the jury.

[11]Section 924.051(1)(b) defines "preserved" as follows:

"Preserved" means that an issue, legal argument, or objection to evidence was timely raised before, and ruled on by, the trial court, and that the issue, legal argument, or objection to evidence was sufficiently precise that it fairly apprised the

This court cannot presume that a Florida court ignores its own procedural rules when that court issues a summary denial of relief.  Such a ruling does not suggest that the state court resolved the issue on the federal claim presented.  *See Coleman*, 501 U.S. at 735-36, 111 S.Ct. 2546; *Kight v. Singletary*, 50 F.3d 1539, 1544-1545 (11th Cir. 1995) (applying procedural bar where state court's summary denial did not explain basis for ruling); *Tower v. Phillips*, 7 F.3d at 209 (applying bar where state court did not rule on claims presented).  Indeed, the Eleventh Circuit has instructed that where the state has briefed both an applicable procedural bar and the merits with respect to a given point, and the appellate decision is silent on the point, it should be presumed that the state decision rests on the procedural default.  *See Bennett v. Fortner*, 863 F.2d 804, 807 (11th Cir. 1989) ("This circuit to a point has presumed that when a procedural default is asserted on appeal and the state appellate court has not clearly indicated that in affirming it is reaching the merits, the state court's opinion is based on the procedural default.").[12]  Petitioner has made none of the requisite showings to excuse his default; therefore this court should not reach the merits of this claim.

Alternatively, assuming the state court reached the merits of both aspects of petitioner's present claim, petitioner is not entitled to federal habeas relief because he does not meet his threshold burden under the AEDPA standard.  Petitioner does not undertake to show that the state affirmance resulted in a decision that was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

---

trial court of the relief sought and the grounds therefor.

Fla. Stat. § 924.051(1)(b).

[12]In *Bennett*, as here, the state court disposition failed to indicate whether the affirmance of the conviction at issue was on the merits or on a procedural bar. There, as here, the state attorney briefed both the procedural bar issue and the merits.  *Explicitly distinguishing the case where the state briefs only the merits in state court, see Bennett*, 863 F.2d at 807, the Eleventh Circuit presumed that the state court decision rested on the procedural issue--not on the merits.

A.      **Clearly Established Federal Law**

"In all prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  A primary interest secured by the Confrontation Clause is the opportunity of cross-examination, including impeachment.  *Davis v. Alaska*, 415 U.S. 308, 315-16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); *see Kentucky v. Stincer*, 482 U.S. 730, 736, 107 S.Ct. 2658, 2662, 96 L.Ed.2d 631 (1987); *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1370 (11th Cir. 1994) ("The Confrontation Clause guarantees criminal defendants an opportunity to impeach through cross-examination the testimony of witnesses for the prosecution.").  The defendant's right to cross-examine witnesses is not without limitation, however.   He is entitled only to an opportunity for effective cross-examination, not cross-examination that is effective "in whatever way, and to whatever extent, the defense might wish."  *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (per curiam).  The trial judge has wide latitude to impose reasonable restrictions on cross-examination based upon concerns such as "confusion of the issues or interrogation that is repetitive or only marginally relevant."  *Baptista-Rodriguez*, 17 F.3d at 1370-71.  "A defendant's confrontation rights are satisfied when the cross-examination permitted exposes the jury to facts sufficient to evaluate the credibility of the witness and enables defense counsel to establish a record from which he can properly argue why the witness is less than reliable."  *Id.*, at 1371.

B.      **Review of State Court Decision**

In the instant case, the trial court disallowed impeachment with Ms. Martin's deposition testimony concerning the reason she wore the tampon, finding that it "would be impeachment on a collateral issue and evidence to show that she was a topless dancer, which I've already ruled was inappropriately prejudicial."  (Ex. B, p. 334).  This conclusion is amply supported by the record.  As the trial judge pointed out, there was no dispute that Ms. Martin was wearing a tampon during the sexual assault.  Thus, there was nothing for the jury to decide with respect to this fact.  Ms. Martin further testified that she does not use a tampon when having consensual sex.

(Ex. B, p. 121).  Evidence concerning why she was wearing a tampon, and whether her use of tampons was atypical, did not tend to prove or disprove any material fact in dispute, including consent.[13]

Moreover, at trial defense counsel was permitted to, and did, expose the jury to facts that enabled the defense to argue why Ms. Martin should not be believed. During closing argument, the defense urged the jury to find that Ms. Martin's testimony was not credible, emphasizing inconsistencies between her trial testimony and that of other witnesses, as well as inconsistencies between her trial testimony and pretrial statements.  (*Id.*, pp. 386-87, 391-92).  Defense counsel further argued that Ms. Martin was motivated to fabricate or exaggerate what had happened either because she wanted to gain her former boyfriend's sympathy and reunite with him or because she was upset that petitioner had not used a condom.  (*Id.*, pp. 384-85).

As the proffered cross-examination was only marginally relevant, and the defense was permitted cross-examination which exposed the jury to facts sufficient to evaluate Ms. Martin's credibility and enabled defense counsel to establish a record from which he could properly argue why Ms. Martin was less than reliable, this court cannot say that the state court's denial of relief on this claim was contrary to, or an unreasonable application of, clearly established federal law.

4.      <u>"Ineffectiveness of counsel based on trial counsel's advice concerning the decision not to testify."</u>

As his final ground, petitioner claims trial counsel was ineffective for his advice concerning petitioner's decision not to testify.  Specifically, petitioner complains:

> My lawyer did not advise me to testify, and even discouraged me from testifying, even though the defense at trial was consent and I was the only person who could provide evidence that there was consent.  No

---

[13]Further, as respondent points out, Ms. Martin testified on direct that, "I just usually always wear a tampon."  (Ex. B, pp. 85-86).  Thus, if, as petitioner claims, jurors may have believed that a woman who wears a tampon even when she is not menstruating might be more likely to engage in consensual sex while wearing a tampon, they had the evidence to make this inference, even without the additional evidence on cross-examination that Ms. Martin always wore a tampon because she was a topless dancer.  Thus, the proffered testimony would have added nothing relevant to the evidence.

competent lawyer would have failed to advise a person in my situation
to testify.

(Doc. 1, p. 5).  Respondent concedes petitioner exhausted his state court remedies
with respect to this claim by raising the issue in his motion for post-conviction relief.

> A.    Clearly Established Federal Law

A criminal defendant has a fundamental constitutional right to testify on his
own behalf at trial that cannot be waived by defense counsel.  *United States v.
Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992).  The proper vehicle for a claim that
defense counsel's conduct led to a violation of this right is an ineffective assistance
of counsel claim.  *Id.*, at 1534.

In order to prevail upon a claim of ineffective assistance of counsel, the
petitioner must prove that:  (1) "counsel's representation fell below an objective
standard of reasonableness," and (2) "there is a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding would have been
different."  *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d
674 (1984).

"The purpose of ineffectiveness review is not to grade counsel's
performance."  *Chandler*, 218 F.3d 1305, 1313 (11th Cir. 2000) (citing *Strickland*).  In
evaluating counsel's performance, reviewing courts must indulge a strong
presumption that counsel's conduct fell within the wide range of reasonable,
professional assistance.  *Chandler* at 1314.  "Therefore, the cases in which habeas
petitioners can properly prevail on the ground of ineffective assistance of counsel
are few and far between."  *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir.), *cert. denied*,
513 U.S. 899, 115 S.Ct. 255, 130 L.Ed.2d 175 (1994).  In evaluating the reasonableness
of counsel's actions, a court must make "every effort . . . to eliminate the distorting
effects of hindsight" and must evaluate the reasonableness of counsel's
performance "from counsel's perspective at the time."  *Strickland*, 466 U.S. at 689,
104 S.Ct. at 2065.  As the Eleventh Circuit has emphasized:

> We must avoid second-guessing counsel's performance: "[I]t does not
> follow that any counsel who takes an approach we would not have
> chosen is guilty of rendering ineffective assistance."  *Waters [v.
> Thomas*, 46 F.3d 1506], 1522 (en banc).  Nor does the fact that a

particular defense ultimately proved to be unsuccessful demonstrate ineffectiveness.

*Chandler* at 1314 (footnote omitted).  Moreover, an ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of effective representation.  Where the record is incomplete or unclear about counsel's actions, it will be presumed that he did what he should have done, and that he exercised reasonable professional judgment.  *Chandler* at 1314 n.15.

In order to meet the prejudice prong of the *Strickland* standard, petitioner must allege more than simply that the unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding."  466 U.S. at 693, 104 S.Ct. at 2067.  Instead, the petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.*, at 694, 104 S.Ct. at 2068.  Without support in the record, bare allegations that the petitioner was prejudiced by counsel's performance are not sufficient.  *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).  In applying *Strickland* the court may dispose of an ineffective assistance claim if petitioner fails to carry his burden on either of the two prongs.  *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999).

B.      Review of State Court Decision

In his Rule 3.850 motion, petitioner alleged that counsel "misadvis[ed] him and coerc[ed] him into not testifying."  (Ex. A, p. 418).  According to petitioner, counsel told him that if he testified, the state would be able to ask him about his prior convictions, that "the nature of the convictions would be heard by the jury," and that juries typically convict when they hear that a defendant has a prior record. (*Id.*).  Petitioner further alleged that counsel told him it was not necessary for him to testify because the state's case was weak, and that testifying would only give the

state an opportunity "to make him look bad."  Petitioner admitted that he personally told the court he would not testify, but contended that he did so "under the misadvice of counsel."  (*Id.*, p. 419).

The Rule 3.850 court held an evidentiary hearing, at which petitioner was represented by counsel.  After hearing testimony from petitioner and his former trial counsel, Samuel Hall, the Rule 3.850 court denied relief, noting that the trial court specifically asked petitioner whether he wished to testify and petitioner responded: (1) that he did not wish to testify, (2) that the decision not to testify was his decision, and (3) that no one coerced him into the decision.  (Ex. A, p. 669).  The 3.850 court further concluded, "[Petitioner] fails to establish any misadvice by counsel which would undermine the knowing and voluntary waiver of that right."  (*Id.*).  The facts of this case are not materially indistinguishable from those in *Strickland*; thus, petitioner is not entitled to relief unless he establishes that the Rule 3.850 court unreasonably applied *Strickland* to the facts of this case.  Petitioner has not done so.

As the Eleventh Circuit explained in *United States v. Teague, supra*:

Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide.  This advice is crucial because there can be no effective waiver of a fundamental constitutional right unless there is an "intentional relinquishment or abandonment of a known right or privilege."  Moreover, if counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify.  The defendant can then make the choice of whether to take the stand with the advice of competent counsel.

953 F.2d at 1533 (footnotes omitted) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)).  The *Teague* court specifically noted the existence of sound tactical reasons why it may not be best for the defendant to testify in some circumstances: "Some examples might be . . . if the defendant might be prejudiced by revelation of prior convictions, or if the prosecutor might impeach the defendant using a prior inconsistent statement."  *Id.* at 1533 n.9.

At the Rule 3.850 evidentiary hearing, petitioner testified that prior to trial he and counsel discussed the issue of him testifying.  According to petitioner, counsel advised him that if he testified, his prior criminal record "could be used against [him];" that the jury would learn of petitioner's two prior felony convictions; and that petitioner's prior convictions would not sit well with them.  (Ex. A, p. 582).  Petitioner went on, however, to disclaim the allegations in his Rule 3.850 motion that trial counsel told him the jury would learn the <u>nature</u> of his prior convictions if he testified.  (*Id.*, p. 583).  When asked to identify the particular misadvice by trial counsel concerning his right to testify, petitioner was unable to articulate any specific error that led to a violation of his right.[14]  Petitioner eventually indicated that

---

[14]The relevant portion of petitioner's Rule 3.850 testimony is as follows:

Q [Petitioner's court-appointed counsel].  And how were you misadvised by your attorney as to the necessity of your testifying?

A [Petitioner].  Because the day before I supposed to have testified, I was told that I needed to testify about the witnesses lying -- the witness lying in the case, and also Detective Wass lying in the case, to make a case and --

Q.  You were told by Mr. Hall it would be necessary for you to testify?

A.  That he wanted -- he wanted me -- he wanted me to testify.

Q.  How about before trial?  Did y'all have any discussions about whether or not you would testify?

A.  Yes.  That was before trial.

Q.  Before trial itself?

A.  Yes, also, uh-huh, that I needed to testify.

. . . .

Q.  Now, I touched on this earlier, but I think we got sidetracked.  We talked about how you came in the next morning and Mr. Hall had told you not to testify.

A.  Due to the lack of evidence in the case, he would not want me to testify.

Q.  How is it -- you feel he misadvised you that day?

A.  Absolutely, sir.  Because this was more important to me, to testify about a person not making a deposition in three-and-a-half months and to elaborate [sic] with a bias investigator in this case who wanted to get me at all costs.  Because from the beginning at the first meeting, he told me that, I know you -- I know you sell your car

out for drugs, and I did not say anything like that.

Q.  But what is it that Mr. Hall told you that you feel constituted misadvice and ineffective assistance of counsel?  What is it that he told you?

A.  That he wanted me to testify, and I was ready to testify.  Then the day I was supposed to have testified --

Q.  I understand.  But what was it he told you other than saying, I don't think you should testify?  What is it that he said to you that you relied on in deciding not to testify?

A. Because the State would bring up issues in my record, that I have two felonies, and the jury would likely convict a person that has two felonies. . . .

Q.  Do you recall in your motion stating that counsel advised you it was not necessary for you to testify because of a lack of State's evidence?

A.  Exactly, sir.

Q.  But what is it that he told you that they were lacking in evidence?  How did he put it to you?

A.  I took it as I did not have a knife and I did not have a pistol and force this young lady to have sex with me.  And I thought that due to that evidence alone would exonerate me and that there was no need to testify.

Q.  Is that what he told you?

A.  No.  He just told me due to the lack of evidence in the case, he would not -- he would not want me to testify.

Q.  So you took lack of evidence to mean you just sort of -- when he used the phrase "lack of evidence," what did that mean to you?

A.  That I could stand firm on -- on the issues that I presented to him during this whole meeting and discussion that we had about my being innocent.

Q.  Well, did you say anything to Mr. Hall like, Wait.  You tell me before trial I should testify.  You told me yesterday I should testify.  You're telling me today I should not testify?  Why is it you're now telling me not to testify?

A.  No, sir, because I knew that the evidence in the case was not overwhelming and that it was fabricated by the state.

Q.  So you didn't have any discussion with Mr. Hall as to why he had changed his advice?

A.  No sir, because at that time I thought he was competent.

Q.  Well, this is your chance to say, Mr. Tracy.  What is it you feel was incompetent by

he himself felt it was critical that he testify because it was his word against Ms. Martin's word, and that counsel erred in failing to affirm that belief.   (*Id.*, pp. 588, 602-06).   On cross-examination, petitioner admitted that trial counsel discussed the evidence  against him and the pros and cons of testifying.   Two specific disadvantages of testifying were the jury learning that petitioner was a convicted felon and petitioner having to explain his changing statements to Investigator Wass.

---

what he's told you on that day when he told you not to testify, or advised you not to testify?

A.  Well, me believing that I had not committed a crime, then, yes, due to the lack of evidence in the case, that it's affirmative that I should not testify, if that's what his advice be.  But I wanted to testify on my behalf, because it was her -- it was this person's word against mine.  And for her to elaborate that I had taken out a pistol and throwed it in the backseat or I had a knife up to this person up to that point and the cut mark went this way and how I supposedly had a knife this way and the cut went that a way, the scratch that was self-inflicted, um, be any evidence overwhelming.

Q.  Did you and Mr. Hall discuss whether or not it was critical for you to testify that day?

A.  Sir?

Q.  The day that you came into court in the morning, you say he told you, you know, it wasn't in your best interest to testify.  Did y'all discuss whether or not it was critical for you to testify?

A.  No, sir.

Q.  But you now feel that it was?

A.  Since I didn't have a really bad record.

Q.  But you're now saying it was critical for you to testify?

A.  Yes, it was critical for me to testify.

Q.  And that that's what he should have told you?

A.  Yes, sir.

Q.  And that's what your attempting to say in your motion, you feel like you've said; is that correct?

A.  That's correct.  The outcome would have been a lot different, sir.

(Ex. A, pp. 588, 602-06).

(*Id.*, pp. 616-18).  Petitioner also admitted that he had not questioned trial counsel when counsel advised him not to testify.  (*Id.*, p. 618).

Petitioner's trial counsel, Samuel Hall, testified at the Rule 3.850 evidentiary hearing.  According to Mr. Hall, he and petitioner discussed the upside of petitioner testifying -- that he was the only one who could testify that the sex was consensual.  The two also discussed the downside of petitioner testifying -- petitioner's prior felony convictions, petitioner's inconsistent statements to Investigator Wass which would be used to impeach his credibility, and the state's evidence against petitioner.  (*Id.*, pp. 637-38).  According to Mr. Hall, petitioner made the ultimate decision not to testify:

> A [Mr. Hall].  Well, he made the ultimate decision.  I don't really say I can remember everything I said to him.  Normally, I just say, you know, We're coming up.  You can -- you have the right to testify, you know, and reiterate some of those things that we talked about.  As far as -- you know, I talked about the downside of him testifying, the inconsistencies, prior record would come out, and he made a conscious decision not to testify.  I didn't try to say, yes, you should testify, or, no, you should not testify.  I left it up to him.
>
> . . . .
>
> I can say this: I've got a memory that Mr. Tracy and I discussed it.  We discussed his testimony, whether or not he was going to testify, the pros and cons of testifying.  But he never was, I can say, real eager, Hey, I want to get up there and testify.  I've got to tell my side of this.  There was never anything -- anything like that.

(*Id.*, pp. 639-40).  Mr.  Hall stated that he did not coerce petitioner in any way or threaten him.

On cross-examination, Mr. Hall testified that prior to trial "it was . . . a 50/50 deal whether [petitioner] would or would not testify," and that at the close of the state's case he was leaning toward advising petitioner not to testify.  (*Id.*, p. 646).  The following morning he met with petitioner before trial and the two discussed the inconsistencies in petitioner's statements to Investigator Wass and the fact that in his last statement to Wass petitioner said the sex was consensual but did not mention anything about it being in exchange for money, which is what petitioner

would say if he testified.  (*Id.*, pp. 649-50).  When Mr. Hall advised petitioner against testifying, petitioner was calm and "didn't have any problem with it."  (*Id.*, p. 650).

In denying relief, the Rule 3.850 court relied on petitioner's sworn statements at trial[15] and on a finding that Mr. Hall's Rule 3.850 testimony was more credible than petitioner's testimony.[16]   This court will not second-guess that credibility determination.  Based on the trial transcript and Mr. Hall's testimony, it was not objectively unreasonable to conclude that counsel correctly advised petitioner of all of the necessary elements for him to make a knowing, voluntary, intelligent decision concerning whether to testify.

Furthermore, counsel did not err by failing to advise petitioner that it was critical for him to testify.  In his habeas petition, petitioner downplays the impact of his inconsistent statements to Investigator Wass, arguing, "those statements were going to be presented to the jury whether I testified or not." (Doc. 1, p. 5).  However, petitioner fails to address the issue raised by his trial counsel -- that had he testified, his credibility would have been further impeached by the fact that he mentioned nothing to Investigator Wass of the alleged "sex for money" deal when he finally

---

[15]The trial transcript reveals the following colloquy between the trial judge and petitioner:

THE COURT: Do you feel like you've had an adequate opportunity to speak to Mr. Hall about the -- your right to testify and to not testify and the consequences of each?

THE DEFENDANT: Yes, sir.

THE COURT: All right.  At this time, he has explained to me that you have elected not to testify in this matter; is that your choice?

THE DEFENDANT: Yes, sir.

THE COURT: Okay.  You understand that you have the right to testify if you want to but you also have the right not to testify; is that your understanding?

THE DEFENDANT: Yes, sir.

THE COURT: Okay.  Has anybody forced you to make this decision not to testify?

THE DEFENDANTS: No, sir.

(Ex. B, pp. 358-59).

[16]There was no other evidence either to corroborate petitioner's version or to negate it.

admitted that he had had sex with Ms. Martin.   Moreover, it is one thing for Investigator Wass to identify petitioner's inconsistent statements.  It is quite another for the jury to see petitioner try to explain why he gave such inconsistent statements.  Petitioner asserts, "I could have explained why I was not forthcoming when Wass questioned me," yet he offers no such explanation to this court, and he alleges no facts to suggest that there is a reasonable probability his explanations would have been persuasive.  As to petitioner's contention that it was unreasonable for his lawyer to be concerned about his prior convictions because he "could have told the jury about [his] convictions for theft and drugs without making [him]self seem like a rapist,"  (*id.*), such argument ignores the impeaching impact of the convictions themselves.   It is the fact of the felony conviction itself that can undermine the credibility of a witness in the eyes of the jury.  *See* Fla. Stat. § 90.610.  In light of the state court record, this court cannot say the state court  unreasonably applied *Strickland* when it denied relief on this claim.

## CONCLUSION

The state court did not unreasonably apply Supreme Court precedent when it denied relief on petitioner's claims of trial court error and ineffective assistance of counsel.  Therefore, federal  habeas relief should be denied.

Accordingly, it is ORDERED:

The clerk shall change the docket to reflect that James McDonough has been substituted as respondent in this cause.

And it is respectfully RECOMMENDED:

That the petition for writ of habeas corpus (doc. 1) challenging the conviction and sentence in *State of Florida v. Kevin Maurice Tracy*, in the Circuit Court of Escambia County, Florida, case number 99-4691, be DENIED and the clerk be directed to close the file.

At Pensacola, Florida this 1st day of March, 2006.

/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  A copy of any objections shall be served upon all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).**